The People of the State of New York ex rel. Pennsyl-
vania Railroad Company, Appellant, *v.* Erastus C.
Knight, as Comptroller of the State of New York,
Respondent.

Tax — Cab Service Maintained and Operated Wholly within
City of New York by Foreign Railroad Corporation Not a
Part of its Interstate Commerce — Capital Employed Therein Is
Taxable. A cab service maintained and operated in the city of New
York by a foreign railroad corporation for the purpose of transporting to
various points therein its passengers who are conveyed to the city by
ferry from its rail terminus in an adjoining state, the service beginning
and ending in the state of New York, is not incidental to nor a part of the
interstate commerce transacted by the railroad corporation, and the
capital employed by it in the maintenance of such cab service is not
exempt from the taxation imposed by sections 182 and 184 of the Tax
Law (L. 1896, ch. 908) relating to franchise taxes upon corporations.

*People ex rel. Penn. R. R. Co.* v. *Knight,* 67 App. Div. 398, affirmed.

(Argued May 5, 1902; decided June 10, 1902.)

Appeal from an order of the Appellate Division of the
Supreme Court in the third judicial department, entered Janu-
ary 14, 1902, which affirmed a determination of the defendant
in assessing a franchise tax against the relator.

The facts, so far as material, are stated in the opinion.

*Henry Galbraith Ward* for appellant. It being admitted
that the tax levied is upon the right of the relator to do busi-
ness in this state if its business done here is of an interstate
character, there can be no dispute as a matter of law that it
is not taxable by the state for doing it. (*People ex rel.*
v. *Wemple,* 138 N. Y. 1.) Vehicles, though transporting
entirely within the state freight and passengers which are
coming from, or going to, other states, cannot be taxed or
regulated by the state. (*The Daniel Ball,* 10 Wall. 557;
*Lord* v. *G. S. S. Co.,* 4 Sawy. 292; 102 U. S. 541; *Foster* v.
*Davenport,* 22 How. [U. S.] 244; *Rhodes* v. *Iowa,* 170 U.
S. 412; *Ex parte Koehler,* 30 Fed. Rep. 869.) Goods car-
ried to a state line and there transferred to other carriers for

1902.] People ex rel. Penn. R. R. Co. v. Knight. 355

N. Y. Rep.] Opinion of the Court, per Cullen, J.

transportation into an adjoining state are still a part of the interstate commerce. (*The Daniel Ball*, 10 Wall. 557; *Cutting* v. *F. R. & N. Co.*, 46 Fed. Rep. 641; *G., etc., Ry. Co.* v. *Armstrong*, 43 S. W. Rep. 614; *State* v. *G. C. & S. F. Ry. Co.*, 44 S. W. Rep. 542.) While a passenger of the Pennsylvania railroad is being transported in one of the relator's cabs he is in a channel of transportation which is not available to the general mass of persons in the state. (*Brown* v. *Maryland*, 12 Wheat. 419.) The tax under sections 182 and 184 of the Tax Law is invalid as to a foreign corporation doing both interstate and domestic business within the state, because it is a tax upon and a license applying to all its business both interstate and domestic, whereas the state can only tax or license domestic business. (*People* v. *H. Ins. Co.*, 92 N. Y. 328; *People* v. *E. T. Co.*, 96 N. Y. 387; *People ex rel.* v. *Wemple*, 131 N. Y. 64; *Hooper* v. *California*, 155 U. S. 652; *Crutcher* v. *Kentucky*, 141 U. S. 57; *U. S. E. Co.* v. *Hemmingway*, 39 Fed. Rep. 60; *People ex rel.* v. *Wemple*, 138 N. Y. 14.)

*John C. Davies*, Attorney-General (*Henry B. Coman* of counsel), for respondent. The cab service of the relator is not a part of its business relating to interstate commerce, neither is it necessarily incidental thereto. (*Coe* v. *Errol*, 116 U. S. 517; *U. S.* v. *A. & P. S. Co.*, 85 Fed. Rep. 271; *U. S.* v. *Boyer*, 85 Fed. Rep. 435.)

Cullen, J. I agree with Judge Bartlett that the only question presented on this appeal is whether the business carried on by the relator, and for which a franchise tax has been imposed, is interstate commerce or not. For, though it may be that the state of New York could levy a franchise tax on the gross earnings of a foreign corporation for the privilege given it of running a cab line within this state, even for the purposes of interstate commerce (see *Maine* v. *Grand Trunk Ry. Co.*, 142 U. S. 217; cited with approval, *American Refrigerator T. Co.* v. *Hall*, 174 U. S. 70), section 184 of

our Tax Law excludes earnings derived from business of an interstate character from liability to the tax. I insist, however, that the transportation for which the relator has been taxed is not interstate commerce. It is not rendered under any contract for transportation from a point within the state to a point without the state, or *vice versa*, but is solely a carriage between two points within the state under a separate contract. As pointed out by the Appellate Division, the use of the relator's cabs is not restricted to those who have previously secured transportation to or from some point on its railroad, nor is such use confined to travelers upon the railroad. Such a traveler may be accompanied by a friend to or from the ferry only, and one intending to travel upon the railroad may change his intention when he reaches the ferry. It is first to be observed that the fact that the relator is a foreign corporation has no effect on the question whether its cab service is interstate commerce or not. A domestic corporation or an individual citizen of this state may engage in interstate commerce as well as any foreign corporation. Transportation from the city of New York to the town of Port Chester is domestic or intra-state commerce, because both places are in this state, although the transportation is performed by a foreign corporation, the New York and New Haven Railroad Company. Transportation from the city of New York to Paterson, New Jersey, is interstate commerce, although it is over the road of a New York corporation, the Erie Railway Company. Therefore, it is the character of the service, not the character of the carrier, that determines whether the transportation is interstate commerce or not. If in the instance suggested by counsel, when a person intending to travel to Washington takes one of the relator's cabs to carry him from the Fifth Avenue Hotel to the relator's ferry station, that transportation is interstate commerce, it is necessarily equally so when he is carried by a cab called from the hack stand in Madison Square opposite. A carrier may engage in both interstate commerce and in domestic commerce, but that fact does not determine the character of the carrier's whole

1902.]   People ex rel. Penn. R. R. Co. *v.* Knight.   **357**

N. Y. Rep.]   Opinion of the Court, per Cullen, J.

business or change what would otherwise be domestic commerce into interstate commerce, or *vice versa.* The fact, therefore, that cabs from the ordinary stands take passengers to any part of the city, does not affect the character of their service when they carry passengers to railway or ferry stations within the state on journeys to points without the state. Nothing is better settled by the decisions of the Supreme Court of the United States than that in the case of interstate transportation the legislature cannot prescribe the charge to be made for even that part of the transportation which is to be performed within the state. ( *Wabash, etc., Ry. Co.* v. *Illinois,* 118 U. S. 557.) Hence, if the doctrine contended for by the relator is correct, the city of New York has no right to prescribe the fares to be charged by public hacks or cabs for transporting travelers to the ferries on the North river except when the traveler intends to take passage to some point in the state of New York, nor for taking travelers to the Grand Central Station, when such travelers are journeying to Boston or to the west.

If this cab service can in any way become part of interstate commerce (of which there may be some doubt as I shall show by the authorities), I insist it can only be such when the service is rendered under an entire contract for continuous carriage to or from some point without the state. It may be that there is no case in the Supreme Court of the United States which directly decides this proposition. But there is no authority to the contrary and there are a number of cases in that court which seem to recognize this as the true test of what transportation constitutes interstate commerce. The question has been presented in litigations arising under the Interstate Commerce Act with reference to railroad companies whose roads lay entirely within a single state. Of such a case the Supreme Court said in *Cincinnati, New Orleans, etc., Ry. Co.* v. *Interstate Commerce Commission* (162 U. S. 184) : " It may be true that the ' Georgia Railroad Company,' as a corporation of the State of Georgia, and whose entire road is within that State, may not be legally compelled to sub-

mit itself to the provisions of the act of Congress, even when carrying, between points in Georgia, freight that has been brought from another State. It may be that if, in the present case, the goods of the James and Mayer Buggy Company had reached Atlanta, and there and then, for the first time, and independently of any existing arrangement with the railroad companies that had transported them thither, the Georgia Railroad Company was asked to transport them, whether to Augusta or to Social Circle, that company could undertake such transportation free from the control of any supervision except that of the State of Georgia. But when the Georgia Railroad Company enters into the carriage of foreign freight, by agreeing *to receive the goods by virtue of foreign through bills of lading, and to participate in through rates and charges*, it thereby becomes part of a continuous line, not made by a consolidation with the foreign companies, but made by an arrangement for the continuous carriage or shipment from one State to another, and thus becomes amenable to the Federal act, in respect to such interstate commerce." So in *Louisville & Nashville Railroad Company* v. *Behlmer* (175 U. S. 648) it was held that the fact that " the several carriers transported hay from Memphis under through bills of lading, by continuous carriage, to Summerville and Charleston " rendered the traffic interstate commerce even as to that part of it performed by a carrier furnishing transportation wholly within a single state. If this be the true doctrine as to the transportation of property, I do not see why it is not equally the true doctrine as to the transportation of persons.

I have suggested that there was some doubt whether under the authorities the relator's cab service could become a part of interstate commerce. In *Munn* v. *Illinois* (94 U. S. 113, Chicago elevator cases), in answer to the claim that the warehouses and elevators were instrumentalities of interstate commerce, it was said by the court: " The warehouses of these plaintiffs in error are situated and their business carried on exclusively within the limits of the State of Illinois. *They are used as instruments by those engaged in State as well as*

1902.]  People ex rel. Penn. R. R. Co. *v.* Knight.    359

N. Y. Rep.]    Opinion of the Court, per Cullen, J.

*those engaged in interstate commerce, but they are no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another.*  Incidentally they may become connected with interstate commerce, but not necessarily so.  Their regulation is a thing of domestic concern, and, certainly, until Congress acts in reference to their interstate relations, the State may exercise all the powers of government over them, even though in so doing it may indirectly operate upon commerce outside its immediate jurisdiction." In *Coe* v. *Errol* (116 U. S. 517) it was said : " ' Whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced. (*The Daniel Ball,* 10 Wall. 565.)' But this movement does not begin until the articles have been shipped or started for transportation from the one State to the other.  The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey.  That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation."  In the recent case of *Detroit, etc., Ry. Co.* v. *Interstate Commerce Commission* (43 U. S. App. 308) it was held that the cartage of goods by the railroad company to and from the station for shippers and consignees was not within the Interstate Commerce Act.  It is there said : " We cannot think that, under the circumstances, it was the intention of Congress to confuse in our legislation the carting to and from the stations with the transportation on the rails, and if the act can be interpreted to avoid that confusion, it should be done.  We may suppose, since with us it is a business done almost exclusively by outsiders and rarely by the railroad companies, *and being usually done wholly within the territorial limits of a State is not within the jurisdiction of Congress,* that it was not intended to interfere with it except so far as it might affect directly the transportation of goods between the States, by being used as a device to evade the jurisdiction over that subject."  This

case was affirmed by the Supreme Court in 167 U. S. (p. 633) which expressed its approval of the view of the court below "that the railway transportation ends when the goods reach the terminus or station and are there unshipped, and that anything the company does afterwards, in the way of land transportation, is a new and distinct service, not embraced in the contract for railway carriage."

There remain to be considered two cases on which the relator largely relies as authorities for its contention. The first is a case of the relator in this court reported in 138 N. Y. (p. 1). There it was held that a franchise tax could not be imposed on the relator for capital invested in its ferry station and terminal grounds in the city of New York, although the property itself was subject to taxation. At that time the business of the relator, so far as it was prosecuted within this state, was confined to the operation of a ferry from Jersey City to New York and to the maintenance at the latter place of its wharves, ferry house and terminal facilities. The case was unquestionably properly decided under the doctrine declared in *Gloucester Ferry Co.* v. *Pennsylvania* (114 U. S. 196). There the plaintiff, a New Jersey corporation, ran a ferry from Gloucester in that state to Philadelphia. It had no property in the latter city other than a wharf which it leased. Its steamboats were registered in New Jersey. A tax imposed by the state of Pennsylvania upon the dividends of all corporations doing business within the state was held illegal as against that company. Judge Field said: "As to the second reason given for the decision below, that the company could not lease its wharf in Philadelphia except by the implied consent of the Legislature of the Commonwealth, and thus is dependent upon the Commonwealth to do its business, and, therefore, can be taxed there, it may be answered that no foreign or interstate commerce can be carried on with the citizens of a State without the use of a wharf, or other place within its limits on which passengers and freight can be landed and received, and the existence of power in a State to impose a tax upon the capital of all corporations engaged in foreign or

1902.]  People ex rel. Penn. R. R. Co. v. Knight.   361

N. Y. Rep.]     Opinion of the Court, per Cullen, J.

interstate commerce for the use of such places would be inconsistent with and entirely subversive of the power vested in Congress over such commerce." It is contended that no distinction can be drawn between the right of the relator to transport its passengers by ferry to the city of New York across the waters of the Hudson, which are within the limits of this state, and its right to transport passengers by cabs to and from points in the city of New York. I insist that there is a marked distinction between the two rights, and that the distinction is recognized in all the cases in the Supreme Court of the United States which deal with the subject. In *Railroad Company* v. *Maryland* (21 Wall. 456) it was urged that transportation on land was governed by the same principle as transportation by water and exempt to the same extent from state control. The court decided against this contention, and it. was held : "Commerce on land between the different States is so strikingly dissimilar in many respects from commerce on water, that it is often difficult to regard them in the same aspect in reference to the respective constitutional powers and duties of the State and Federal governments. No doubt commerce by water was principally in the minds of those who framed and adopted the Constitution, although both its language and spirit embrace commerce by land as well. Maritime transportation requires no artificial roadway. Nature has prepared to hand that portion of the instrumentality employed. The navigable waters of the earth are recognized public highways of trade and intercourse. No franchise is needed to enable the navigator to use them. Again, the vehicles of commerce by water being instruments of intercommunication with other nations, the regulation of them is assumed by the National legislature. So that State interference with transportation by water, and especially by sea, is at once clearly marked and distinctly discernible. But it is different with transportation by land." The foregoing extract from the case cited was quoted with approval in *Pullman's Car Co.* v. *Pennsylvania* (141 U. S. 18). The navigable waters of the United States, even when they lie

exclusively within the limits of a state, are open to all the world, except so far as Congress may prescribe to the contrary, and it requires no leave or license from a state (except compliance with its police regulations and possibly payment of tolls imposed to defray the cost of improvements in navigation) for a vessel to journey on those waters. Not so on the land. No one can construct and operate a turnpike or railroad within a state unless by grant from the state or by the authority of Congress under its constitutional power to establish post roads.

The second case relied on by the appellant is *The Daniel Ball* (10 Wall. 557). In that case the question was whether a steamboat engaged in navigating Grand river, Michigan, wholly within that state, was required to take out a license in compliance with the provisions of the United States statute. Some articles of freight carried by the vessel were marked for points without the state, though it did not appear that they were being transported under any agreement for continuous transportation to such points. It was held that the steamer was engaged in interstate commerce and subject to the regulations of Congress. Doubtless this case would be an authority for the position of the relator had not the court been careful to say : " The present case relates to transportation on the navigable waters of the United States, and we are not called upon to express an opinion upon the power of Congress over interstate commerce when carried on by land transportation." In *Lord* v. *Steamship Company* (102 U. S. 541) the question was as to the application of an act of Congress limiting the liability of shipowners to the case of a vessel navigating the high seas between ports of the same state. It was held that the transportation was subject to congressional regulation. In that case there appears to have been found no freight destined to points without the state. So it was necessary to place the decision on a different ground from that on which the decision in *The Daniel Ball* rested. It was held that while Congress had no control over the internal commerce of the state, still the vessel when navigating the Pacific ocean,

though between two ports of the same state, was engaged in commerce with foreign nations and was subject to the regulating power of Congress.  *Matter of Garnett* (141 U. S. 1) presented the question again.  There a steamer was engaged in the carrying trade between Augusta and Savannah, both on the same river in the state of Georgia. The petitioner, a shipper of goods between these two points, alleged that the shipowner's liability was not subject to limitation by the act of Congress.  The case did not fall within the principle of the decision in *The Daniel Ball* or of that in *Lord* v. *Steamship Company*.  It was held that the shipment was subject to the act of Congress, not because it was any part of interstate or of foreign commerce, but by virtue of " the admiralty and maritime jurisdiction granted to the Federal government by the Constitution of the United States," which extends to all public navigable waters.  In *Lehigh Valley Railroad Company* v. *Pennsylvania* (145 U. S. 192) it was contended that the state of Pennsylvania had no power to tax the plaintiff on transportation over its railroad from one point in the state to another where, for a part of the distance, a passenger was carried through another state.  Reliance was placed by the plaintiff in error on the decision of the court in *Lord* v. *Steamship Company* (*supra*).  It is difficult to see why if transportation from one point in a state to another is foreign commerce, because the vessel furnishing the transportation navigates the high seas in its voyage between those places, the same principle would not render transportation by railroad from one point to another in the same state, where the line of the railroad for a part of the distance lay in another state, interstate commerce.  The court, however, held that it was not interstate commerce, and while upholding the decision in the *Lord* case practically repudiated the ground on which the decision had been placed.  Of the *Lord* case the court said: " But it was unnecessary to invoke the power to regulate commerce in order to find authority for the law in question.  As stated by Mr. Justice BRADLEY *In re Garnett* (141 U. S. 1, 12): ' The act of Con-

gress which limits the liability of shipowners was passed in amendment of the maritime law of the country, and the power to make such amendments is coextensive with that law. It is not confined to the boundaries or class of subjects which limit and characterize the power to regulate commerce; but in maritime matters, it extends to all matters and places to which the maritime law extends.'" It will thus be seen that the control of Congress over ships, vessels and the navigation of public waters has finally been placed by the Supreme Court of the United States on the solid foundation of the maritime and admiralty jurisdiction of the Federal government, and that while the decisions actually made in *The Daniel Ball* and *Lord* cases remain the law, the grounds on which they proceeded are no longer deemed tenable and the opinions rendered in those cases, no longer authorities.

In closing, reference should be made to the recent decision of this court in *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Morgan, Comptroller* (168 N. Y. 1). That case, so far from being in conflict with the views I have expressed, is a direct authority for the proposition that the liability of a carrier corporation to a franchise tax on its transportation depends not on the question whether the carrier is a domestic or foreign corporation, but on the character of the transportation itself.

The order appealed from should be affirmed, with costs.

BARTLETT, J. (dissenting). The relator is a foreign corporation, chartered by the state of Pennsylvania, and engaged in the transportation of freight, mails and passengers in the states of New York, New Jersey, Pennsylvania, Delaware and Maryland. Its rail terminus is in the state of New Jersey, at Jersey City, from which point it conveys passengers and their baggage by ferry boats operated by it to various points in the city of New York, including Twenty-third street and North river.

The sole business of the relator in the city of New York, with reference to passengers and their baggage, was taking them from and landing them on the New York shore of the North river, until the month of May, 1897, when it established

a cab stand at the Twenty-third street ferry, which it has since maintained, its sole object being to carry passengers and their baggage, arriving at and departing from the city of New York at this point, to and from their residences or hotels.

The facts are undisputed, and the statements contained in the petition for the writ of certiorari, and the affidavit of the officer of the relator subsequently submitted, are the foundation upon which the assessments involved herein rest.

The relator alleges that the cab service is incidental to and part of its business of interstate commerce, and is of no value whatever except as a part thereof, because it is, and always has been, separately considered, carried on at a loss.

It is further alleged that the charge for cabs is separate from the charge for the balance of the passenger's transportation, and that it is necessarily so from the nature of things, it being impossible to include in the railroad and ferry tickets the price of the cab service, as it varies in amount in every case, according to the distance the passenger is to be carried; and, also, for the reason that passengers buying railroad tickets to New York do not know whether they will employ a cab or not; and in respect to passengers starting from New York it would be impossible to supply the drivers of the cabs with tickets to distant destinations in other states.

The record discloses that the state comptroller did not assess a tax on this cab service until the autumn of the year 1900, when he applied to the relator for a statement of the gross receipts and gross expenses of the cab service to June 30th, 1900, and also for the value of personal property employed during that time, and the value of any real estate used by the relator in the city of New York in connection with such cab service.

The comptroller seeks to assess the relator under two distinct sections of the Tax Law (Laws of 1896, chap. 908) upon the business of the cab service thus conducted in connection with its interstate railway service.

Section 182 of the Tax Law imposes a franchise tax on domestic corporations. At the close of this section it is pro-

vided as follows: " Every corporation, joint stock company or association organized, incorporated or formed under the laws of any other state or country, shall pay a like tax for the privilege of exercising its corporate franchise or carrying on its business in such corporate or organized capacity in this state, to be computed upon the basis of the capital employed by it within this state."

Section 184 of the Tax Law provides for an additional franchise tax on transportation and transmission corporations and associations, which reads as follows: " Every corporation and joint stock association formed for steam surface railroad, canal, steamboat, ferry, express, navigation, pipe-line, transfer, baggage express, telegraph, telephone, palace car or sleeping car purposes, and all other transportation corporations not liable to taxes under sections one hundred and eighty-five or one hundred and eighty-six of this chapter, shall pay for the privilege of exercising its corporate franchises of carrying on its business in such corporate or organized capacity in this state, an annual excise tax or license fee which shall be equal to five-tenths of one percentum upon its gross earnings within the state, which shall include its gross earnings from its transportation or transmission business originating and terminating within this state, but shall not include earnings derived from business of an interstate character."

The return called for was duly made to the comptroller, who assessed a tax under section 182 of $934.07, based on the gross earnings of the cab service for the four years ending October 31st, 1900; also, a tax was assessed under section 184 of $1,422.54, being equal to five-tenths of one percentum upon the gross earnings within this state.

It was stipulated before the comptroller, on the application to review this assessment, that it was made solely upon the ground that the relator's cab service in the city of New York is a part of and incidental to its interstate commerce business and, therefore, not taxable. The comptroller after a hearing duly had refused to make any revision or restatement of the assessment and tax.

The Appellate Division having affirmed the decision of the comptroller, this court is now called upon to review the order to that effect.

If the relator is legally taxable on its cab service, no question is made as to the manner in which the taxes were assessed.

The legislature has stated in express terms in section 184, in computing a tax thereunder, that earnings derived from a business of an interstate character should not be included.

It is true, as suggested by counsel, that the precise point presented by this appeal has never been considered by the court. It is, however, equally true that the controlling principles involved in this case were carefully considered by the court in *People ex rel. Pennsylvania Railroad Company* v. *Wemple, Comptroller* (138 N. Y. 1). The opinion in the case cited was written by Chief Judge ANDREWS, wherein is elaborately discussed the constitutional question now presented for decision. The learned judge thus states the facts in the case before him : " The relator is a Pennsylvania corporation, operating a line of railroad for the transportation of freight and passengers, extending through the state of New Jersey into other states of the Union. No part of its road is within the state of New York. But it operates in connection with its road a ferry from the New Jersey shore across the Hudson river to the city of New York, where it has terminal facilities, consisting of wharves, piers, docks and buildings connected therewith, used in the prosecution of the business of delivering freight and passengers carried over its line to that city, and of receiving freight and passengers to be carried from the city into New Jersey and other states reached by its system of roads. The only transportation over New York territory, carried on by the relator, is over that part of the Hudson river within the territorial boundaries of the State by means of its ferry boats. It collects in the city of New York money due for transportation to that point and for transportation from that city and there makes contracts for transportation of freight and passengers over its lines and issues and sells pas-

senger tickets. It employs in the city of New York a large number of agents, clerks and laborers in the prosecution of its business. It is engaged in no business in that city except such as relates to the transportation of freight and passengers over its lines."

It was claimed on behalf of the relator in the case cited that the tax imposed was upon interstate commerce in violation of the so-called "Commerce Clause" of the Federal Constitution. (Article 1, § 8, clause 3.)

The learned judge further stated in his opinion as follows : " In determining the question now presented, two propositions must be deemed established. One is that the business in which the relator was engaged in this state was exclusively that of interstate commerce. Whatever it did here was incident to and in aid of the business of interstate transportation. Interstate transportation was not a part of its business only in this state. \* \* \* The second point which must be deemed to be established is that the tax imposed upon corporations \* \* \* is a tax upon the ' corporate franchise or business,' and is not a tax upon property. \* \* \* We come, therefore, to the crucial question in the case — can the state of New York tax the relator, a foreign corporation, upon its business carried on in this state, which is exclusively the business of interstate commerce. The question stated in another form is, may a state tax a foreign corporation whose business in such state is exclusively that of interstate commerce for the privilege of transacting that business here because, as we have held, this is the essential nature of the tax under the act of 1880. (*People ex rel. S. C. O. Co.* v. *Wemple*, 131 N. Y. 68.) The state may subject to a property tax, in common with other property, every description of property, real and personal, having its *situs* there, although used or employed exclusively in the business of foreign or interstate commerce. Ships or vessels engaged in foreign or coastwise commerce may be taxed at their home port and the products of one state carried into another and there held for sale by the original purchaser, and may be taxed even before

1902.] People ex rel. Penn. R. R. Co. v. Knight. 369

N. Y. Rep.]        Dissenting opinion, per Bartlett, J.

sale in the state to which they have been taken. \* \* \*
If the tax imposed upon corporations by the act of 1880, and
the subsequent statutes amending the same had been a prop-
erty tax instead of a tax on franchise or business, it would not,
as we interpret the decisions of the United States Supreme
Court, have been subject to the objection now made in behalf
of the relator, nor could the relator have lawfully resisted its
payment. \* \* \* The tax against the Pennsylvania Rail-
road Company, involved in this case, was distinctly a tax on
its business, and that business in this state, as we have said,
was exclusively interstate commerce. \* \* \* The relator
is lawfully here, and being here it cannot, we think, under
the authorities be lawfully subjected by the state to a tax
upon its business of interstate commerce, or for the privilege
of conducting its business here."

I have thus indicated the precise points upon which the
decision in the case cited rests. In that case, as in this, the
relator was the Pennsylvania Railroad Company. The ques-
tion in that case was whether the transportation of passengers
from its railway terminus in Jersey City, over certain terri-
tory of the state of New York, in ferry boats, was a continu-
ation of its interstate commerce. In this case the question
is, that if the same relator continues the transportation of its
passengers still further into the territory of the state of New
York by cab, whether it is a continuation of its interstate
business.

The only point raised by the relator in this appeal is based
upon the proposition that the transportation of passengers
from the New York side of the ferry to and from their resi-
dences or hotels is as much a part of its interstate business as
was the transportation of its passengers by ferry boat, which
was approved by this court and held to be exclusively inter-
state commerce.

It is uncontroverted in this record that the relator does not
seek to do, and does not carry on a general cab business in the
city of New York. It further appears that these cabs are

solely used for the purpose of the transportation of passengers coming from or going to the line of the relator's road.

The argument on behalf of the state comptroller is that this cab service is to be regarded, necessarily, as an independent business; that it is no part of the transportation of a passenger (by way of illustration) traveling from Washington to the Fifth Avenue Hotel in the city of New York.

We are unable to see any distinction between the right of the relator to transport its passengers by ferry, or by cab, to or from points in the city of New York. It can be said of the relator in this case, as it was said of it in the case cited, that "it is engaged in no business in that city except such as relates to the transportation of passengers    *    *    *    over its lines."

It is insisted on behalf of the state comptroller that the cab service is to be regarded as starting and terminating within the state of New York. Even if this were so, that fact alone does not characterize the cab service exclusively as a domestic business.

While we are to be controlled by the decisions of the Supreme Court of the United States, when applicable to a case involving a Federal question, I am of opinion that to extend the rule, as laid down in the case involving the rights of this relator and already cited, to the new facts now presented is not in conflict with any decision of that court, but, on the contrary, is in harmony with a number of well-considered authorities.

In the case of *The Daniel Ball* (10 Wall. [77 U. S.] 557) the question was whether the steamboat named, which was engaged in navigating Grand river, Michigan, wholly within the limits of that state, should be licensed under the United States statute. It appeared that some of the goods carried by it were destined to and marked for points beyond the state of Michigan. The court said (p. 565), referring to the question of interstate commerce: "She was employed as an instrument of that commerce; for, whenever a commodity has begun to move as an article of trade from one state to another, com-

merce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity, *some acting entirely in one state* and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of Congress."

The relator, by its cab service, simply extended its care of passengers at a loss to itself and provided an additional means of transportation which conveyed them for a reasonable compensation to their destinations in the city of New York. These passengers, when in the cabs of the relator, were in the process of transportation precisely as were the goods carried by the vessel *Daniel Ball* marked for points beyond the state of Michigan. (*Lord* v. *Steamboat Co.*, 102 U. S. 541; *Foster* v. *Davenport*, 63 U. S. [22 How.] 244; *Cutting* v. *Florida Railway and Navigation Co.*, 46 Fed. Repr. 641; *Leloup* v. *Port of Mobile*, 127 U. S. 640.)

In the *Leloup* case Bradley, J. (at page 647), said: "But it is urged that a portion of the telegraph company's business *is internal to the State of Alabama*, and, therefore, taxable by the State. But that fact does not remove the difficulty. The tax affects the whole business without discrimination. There are sufficient modes in which the internal business, if not already taxed in some other way, may be subjected to taxation without the imposition of a tax which covers the entire operations of the company."

The case of *Crutcher* v. *Kentucky* (141 U. S. 47) has a very strong bearing in principle upon the question we are now considering. That case involved the transaction of certain business in the state of Kentucky by the plaintiff as the agent of the United States Express Company. Mr. Justice Bradley (at page 59) said: "We do not think that the difficulty is at all obviated by the fact that the express company, as incidental to its main business (which is to carry goods between different states), does also some local business *by carrying goods from one point to another within the State of Kentucky*. This is

372    People ex rel. Penn. R. R. Co. *v.* Knight.    [June,

Dissenting opinion, per Bartlett, J.    [Vol. 171.

probably quite as much for the accommodation of the people of that state as for the advantage of the company. But whether so or not, it does not obviate the objection that the regulations as to license and capital stock are imposed as conditions on the company's carrying on the business of interstate commerce, which was manifestly the principal object of its organization. These regulations are clearly a burden and a restriction upon that commerce. Whether intended as such or not they operate as such. But taxes or license fees in good faith imposed exclusively on express business carried on wholly within the state would be open to no such objection." ·

The case of *Maine* v. *Grand Trunk Railway Co.* (142 U. S. 217) has no application to the case at bar. The defendant operated a portion of its line in the state of Maine and a franchise tax was imposed thereon. The payment was resisted on the ground that it was a tax imposed upon interstate commerce. The Supreme Court of the United States sustained this tax on the ground that the defendant enjoyed a franchise granted by the state of Maine, and it was competent for the legislature to require the payment of taxes as a condition to issuing the grant. These facts clearly distinguish the case from the one now under consideration. It may be, however, remarked that the Supreme Court decided this case on a vote of five to four, and the opinion of the dissenting justices contains cogent reasoning in support of the proposition that the tax is imposed on the business of interstate commerce.

The case of *Coe* v. *Errol* (116 U. S. 517), cited by the respondent, has no application to the case at bar. That case involved the taxation of a raft of logs which had been cut in the state of New Hampshire, and were destined for shipment to the state of Maine. Prior to the time when they were to be started on their interstate journey, a tax was imposed by the state of New Hampshire, which was sustained by the Supreme Court of the United States, on the ground that until the transportation was actually begun these logs were like all other personal property in the state of New Hampshire and liable to taxation; that the mere intention of the

owner when he cut these logs, to ship them into the state of Maine, would not be considered in determining the right of the state to tax the property.

The case of *People ex rel. N. Y. C. & H. R. R. R. Co. v. Morgan, Comptroller* (168 N. Y. 1) has no bearing upon this controversy. In that case the comptroller sought to collect from the relator a tax under section 184 of the Tax Law, for the transportation of domestic mail matter within this state. It appeared, however, that it was impossible to ascertain the proportion of mail which originated and terminated within this state, as distinguished from interstate and foreign mail matter, for the reason that the mail bags could not be inspected for any such purpose. It was held that this state of affairs prevented the assessment of any tax for the transportation of domestic mail matter.

I am of opinion that the taxes imposed upon the relator by the state comptroller are an interference with interstate commerce, and were unconstitutionally levied and void.

The determination of the Comptroller and the order of the Appellate Division should be reversed, with costs.

Parker, Ch. J., Gray, O'Brien, Haight and Werner, JJ., concur with Cullen, J; Bartlett, J., dissents.

Order affirmed.