THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE CONNECTING TERMINAL RAILROAD COMPANY, Relator, v. NATHAN L. MILLER, as Comptroller of the State of New York, Respondent.

*A terminal railroad, acting for various transportation companies in storing, etc., interstate freight, is subject to the State franchise tax.*

A domestic corporation organized in 1881 under the Railroad Act, owned a tract of land in the city of Buffalo fronting on the Niagara river. It constructed thereon a grain elevator and a freight warehouse and a number of railroad tracks. These tracks were used to afford access to its elevator and warehouse by cars owned by other corporations. The corporation in question owned no engines, cars or boats. Its entire business was transacted in the city of Buffalo and consisted in loading and unloading and storing freight which came from without the State of New York and was destined for places within the State or elsewhere, or which came from within the State of New York and was destined for places without that State. It performed this work for the various transportation companies which had terminals on Buffalo harbor and the receipts therefrom constituted its entire revenue.

*Held,* that while the business of the corporation was incidentally connected with interstate commerce, it did not in itself constitute interstate commerce, and that, therefore, the corporation was subject to the franchise tax imposed by section 6 of chapter 542 of the Laws of 1880, as amended by chapter 361 of the Laws of 1881 and by section 184 of the Tax Law (Laws of 1896, chap. 908).

SMITH and CHASE, JJ., dissented.

CERTIORARI issued out of the Supreme Court and attested on the 8th day of May, 1902, directed to Nathan L. Miller, as Comptroller of the State of New York, commanding him to certify and return to the office of the clerk of the county of Albany all and singular his proceedings had in assessing a franchise tax against the relator, a domestic corporation, for seventeen years, ending June 30, 1899.

*Henry Galbraith Ward* and *Sidney Ward,* for the relator.

*John Cunneen, Attorney-General,* and *William H. Wood,* for the respondent.

CHESTER, J.:

This is a proceeding to review the determination of the Comptroller in declining to make a revision and readjustment of an assessment made by him upon the franchise or business of the relator, based on its gross earnings for seventeen years, ending June 30, 1899. The validity of the taxes based upon such assessment is challenged only on the ground that the law authorizing them is in violation of subdivision 3 of section 8 of article 1 of the United States Constitution which gives to Congress the power to regulate commerce among the several States, the claim being that all the earnings upon which the taxes were based were derived by the relator from interstate commerce.

The assessment was made under chapter 542 of the Laws of 1880, and the several acts amending the same, and under section 184 of the Tax Law (Laws of 1896, chap. 908).

The Tax Law (Laws of 1896, chap. 908) provides in section 184 that every transportation and other corporation there defined "shall pay for the privilege of exercising its corporate franchises or carrying on its business in such corporate or organized capacity in this State, an annual excise tax or license fee which shall be equal to five-tenths of one per centum upon its gross earnings within the State which shall include its gross earnings from its transportation or transmission business originating and terminating within this State, but shall not include earnings derived from business of an interstate character."

As the taxes imposed cover seventeen years, reference must be made to the law in force prior to the enactment of the Tax Law.

That is found in section 6 of chapter 542 of the Laws of 1880 (as amd. by Laws of 1881, chap. 361), and provided that every corporation formed for transportation purposes "shall pay to the State Treasurer for the use of the State, as a tax upon its corporate franchise or business in this State, a tax at the rate of five-tenths of one per centum upon the gross earnings in this State of said corporation * * * for * * * transportation * * * business transacted in this State."

There was no exclusion in the terms of the old law as in the new, of earnings derived from interstate commerce. Nevertheless if the relator is correct in its contention that the taxes as against it are an unlawful interference by the State with such commerce, these taxes could not be exacted under the old law any more than under the new, because of the constitutional prohibition which was superior to both statutes. If, on the other hand, the earnings of the relator were not derived from commerce between the States, then it is liable for the tax under both laws.

The important question to be determined, therefore, is whether the earnings which formed the basis for these taxes were derived from business of an interstate character.

The relator is a domestic corporation organized in 1881 under the act to authorize the formation of railroad companies (Laws of 1850, chap. 140, as amd.). It owns a piece of land fronting about 1,650 feet on the Niagara river in the city of Buffalo upon which it has a grain elevator and freight warehouse and several lines of railroad tracks. These tracks are used to afford facilities for access to its elevator and warehouse by cars owned by other companies and for loading and unloading such cars. It owns no engines, cars or boats. Its entire business is transacted in Buffalo and consists in loading, unloading and storing grain and other freights which on the one hand come from places outside the State and are destined to points in the State or elsewhere, and on the other, which come from points in the State and are destined to places in other States. It handles no local freight. All its receipts are from such business and come from the payment to it by the several companies who employ it of fixed charges per bushel on the grain handled and a fixed rate per ton upon the package freight, which charges include the elevator service and the use of the yards

for car storage and car service over its tracks.   These charges also cover a ten-day storage privilege and for freights remaining longer than that an additional storage charge is made.   The shortest storage period is about ten days, and the longest about three months. This work is done by the relator for various railroad and other transportation companies having terminals on Buffalo harbor.

The character of elevator warehouses as related to interstate commerce was a subject of comment in the well-known case of *Munn* v. *Illinois* (94 U. S. 113).   There the Legislature of Illinois passed a law fixing the maximum charge for the storage and handling of grain in elevator warehouses in certain cities and one of the questions presented was whether the law was repugnant to the constitutional power of Congress to regulate commerce between the States. The Supreme Court of Illinois held that it was not and the judgment was affirmed by the United States Supreme Court.   Mr. Chief Justice WAITE, who wrote the prevailing opinion in the latter court, said : " It was very properly said in the case of the *State Tax on Railway Gross Receipts* (15 Wall. 293) that 'it is not everything that affects commerce that amounts to a regulation of it, within the meaning of the Constitution.'   The warehouses of these plaintiffs in error are situated, and their business carried on, exclusively within the limits of the State of Illinois.   They are used as instruments by those engaged in State as well as those engaged in interstate commerce, but they are no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another.   Incidentally, they may become connected with interstate commerce, but not necessarily so.   Their regulation is a thing of domestic concern, and, certainly, until Congress acts in reference to their interstate relations, the State may exercise all the powers of government over them, even though in so doing it may indirectly operate upon commerce outside its immediate jurisdiction."

The *Munn* case, above referred to, has been the subject of much discussion and some criticism in the courts, but in the later case of *Budd* v. *New York* (143 U. S. 517) the cases where the *Munn* case had been commented upon were reviewed and the doctrine of that case was adhered to.   It is true that in the *Budd* case the right

to fix maximum charges by public elevator warehouses was put upon the ground that legislation fixing such charges was a valid exercise of the police power of the State, and no such question is involved in the case at bar, yet the other question involved in the *Munn* case, *i. e.*, as to the character of such warehouses as related to interstate commerce, was referred to, and no dissent from the doctrine of that case in that respect is to be found in the prevailing opinion.

Taking the *Munn* case as an authority, it would appear reasonable to say that while the business of the relator was incidentally connected with interstate commerce, yet its business is not of itself such commerce. It simply performs services all within this State, with the facilities which it has, upon the employment of companies engaged in commerce between the States. Suppose it owned the docks where the boats from the lakes tied up and discharged their freights before being transferred to other carriers, would the charges for wharfage be earnings from interstate commerce? Or if it owned trucks which were employed in carting interstate freights from one dock to another while in transit, or from the terminal of one transportation company to the terminal of another, both in the State, would its charges for such services be such earnings? It seems not, if the *Munn* case is to be regarded as an authority. Yet the services which it renders are of a kindred character to those mentioned. I have grave doubts as to the correctness of this conclusion, yet as the United States Supreme Court is the final arbiter upon a question such as is presented here, until that court departs from the doctrine laid down in the *Munn* case I think it should be followed by us.

It may be said that the conclusion reached finds some support in *People ex rel. Pennsylvania R. R. Co.* v. *Knight* (171 N. Y. 354).

The determination of the Comptroller should be confirmed, with fifty dollars costs and disbursements.

All concurred, except SMITH and CHASE, JJ., dissenting.

Determination of the Comptroller confirmed, with fifty dollars costs and disbursements.